| | | |
|---|---|---|
| | AUSA: Timothy J. Wyse | Telephone: (313) 226-9144 |
| AO 91 (Rev. 11/11) Criminal Complaint | Agent: Nathan Eikost | Telephone: 202-680-3598 |

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

| | | |
|---|---|---|
| United States of America<br>v.<br>Brandi Hawkins | Case No. | Case: 2:20-mj-30252<br>Judge: Unassigned,<br>Filed: 07-16-2020 At 11:18 AM<br>IN RE:SEALED MATTER(CMP)(MLW) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 2020__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666 | Theft or Bribery Concerning Programs Receiving Federal Funds |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1956 (a) | Laundering of Monetary Instruments |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Nathan Eikost - Special Agent
Printed name and title

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: July 16, 2020

City and state: Detroit, MI

_____
Judge's signature

Anthony P. Patti
Printed name and title

# AFFIDAVIT

I, Nathan Eikost, being duly sworn, hereby depose and say:

## I. INTRODUCTION

1. I am a Special Agent with the United States Secret Service assigned to the Detroit Field Office. I have been a Special Agent since January 2018. I have a Bachelor of Science degree with a focus in Criminal Justice from the University of Toledo.

2. I have over two years of federal law enforcement experience and have conducted numerous investigations into violations of federal criminal statutes.

3. I have received training in general law enforcement and criminal investigations at the Federal Law Enforcement Training Center, and at the United States Secret Service Rowley Training Center. More specifically, I have been trained in methods and traits common to fraudulent activities.

4. The information contained in this affidavit is based on my training, experience, and participation in fraud and identity theft investigations, as well as my personal knowledge and observations during the course of this investigation, and information provided to me by other federal agents.

5. Probable cause exists that Brandi HAWKINS violated 18 U.S.C. sections 666, 1343, and 1956 (a). HAWKINS—without lawful authority—knowingly and fraudulently transferred, possessed, used, and processed federal funds intended for pandemic unemployment assistance. Specifically, Hawkins used access and authority granted

1

by the State of Michigan to fraudulently direct these funds into multiple bank accounts via interstate wire transmissions.

## II.  UNEMPLOYMENT INSURANCE – BACKGROUND AND COVID-19

6. The Social Security Act of 1935 initiated the federal and state unemployment insurance (UI) system. The system provides benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment. In the State of Michigan (SOM), the UI system is administered by the Unemployment Insurance Agency (UIA), which is part of the SOM's Department of Labor and Economic Opportunity. The U.S. Department of Labor funds the UIAs administrative costs, including salaries, office expenses, and computer equipment. In any given one-year period, the UIA receives substantially more than $10,000 in federal funding.

7. State unemployment systems and benefits are joint state and federal enterprises largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor. As of the time of this

application, the federal government is providing significant supplemental benefits to the states as a result of the COVID-19 pandemic.

8. The Families First Coronavirus Response Act (FFCRA) became law on March 18, 2020, and provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law on March 27, 2020. The CARES act further expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for unemployment benefits. One such program established to accomplish that was the Federal Pandemic Unemployment Compensation (FPUC) program. The FPUC allows eligible individuals who are collecting certain UI benefits, including regular unemployment compensation, to receive an additional $600 in federal benefits per week for weeks of unemployment ending on or before July 31, 2020. Additionally, the Pandemic Emergency Unemployment Compensation (PEUC) program allows those who have exhausted benefits under regular unemployment compensation or other programs to receive up to thirteen weeks of additional federally funded benefits.

9. The recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the

historic need for unemployment benefits by the American workforce, including in the SOM and in the Eastern District of Michigan (EDMI).

10. Normally (in the absence of fraud), an unemployed worker initiates an UI claim. This is accomplished by submitting a claim in person, over the telephone, or on the internet. Currently, the overwhelming majority of UI claims are filed online through the UIA's website. In order to be eligible for UI benefits, the worker must demonstrate a certain level of earnings in several fiscal quarters immediately preceding the application. The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

11. The SOM UIA will either approve or reject a UI claim based on the application made by the unemployed worker. If the SOM UIA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet at various times during the life of the claim. The worker must also certify that he or she is still unemployed and actively seeking work. One way in which unemployment benefits are provided to a claimant is through the use of a debit card which is mailed to the claimant through the U.S. Postal Service. The unemployment benefits are loaded onto the debit card electronically, and additional benefits are loaded onto the card electronically every two weeks.

### III.     SUMMARY OF INVESTIGATION

12. In June 2020, investigating agents discovered that former State of Michigan Unemployment Insurance Agency contract employee Brandi HAWKINS was involved in a large-scale, fraudulent scheme aimed at defrauding the SOM and the U.S. Government of funds earmarked for unemployment assistance during the pandemic.

13. In April 2020, HAWKINS was assigned as a contract employee to work as an Unemployment Insurance Examiner (UIE) for the SOM. According to Michigan Civil Service Commission on Specification listed on the State of Michigan website, a UIE services claimants, employers, and the general public regarding the SOM's UI programs. SOM officials detailed that UIE's are responsible for reviewing, processing and verifying the legitimacy of various UI claims.

14. Starting from on or about April 21, 2020, HAWKINS worked as a UIE in a full time telework capacity. That is to say, HAWKINS's duty station was her residence in Detroit, Michigan. HAWKINS used a computer provided by her employer, a "soft token," and a username and password to access the State of Michigan's Virtual Private Network (VPN) and the SOM UIA's Michigan Integrated Data Automated System (MiDAS) system. During this time, HAWKINS reported directly to managers in the SOM's UIA.

5

15. HAWKINS worked with outside actors currently unknown to law enforcement. On a daily basis, those actors entered numerous false claims into the SOM's UIA system.

16. HAWKINS used her insider access to fraudulently release payment on these claims. HAWKINS' actions have resulted in the fraudulent disbursement of over two million dollars of federal and state funds intended for unemployment assistance during the pandemic.

17. In order to access the SOM's VPN and MiDAS system, UIE's are assigned an account with a unique username. SOM's records detail that HAWKINS's username to access both the states VPN and MiDAS system is "hawkinsb3." HAWKINS's credentials are unique to her and no other SOM employee is provided with the username "hawkinsb3." SOM's records show that HAWKINS's VPN account was created and given access to the VPN on April 28, 2020, and her MiDAS account was activated in May of 2020.

18. As referenced above, all SOM users are assigned a "soft token," a unique security token required to log into the state's VPN. Users must enter a unique six digit code generated by their security token. The code on each security token changes in designated intervals and is unique to each specific employee. Therefore, a given user must log in with his or her unique username and password as well as with the unique code reflected on their security token at the

time to ensure that only approved users are accessing the VPN and to ensure that each user accessing the VPN is who the SOM believes they are.

19. On June 17, 2020, the SOM directed HAWKINS's employer to remove HAWKINS from the SOM contract. Subsequently SOM managers terminated HAWKINS on June 17, 2020.

20. Once HAWKINS was terminated, her access to the SOM's VPN and MiDAS system should have been also terminated. Through further investigation agents learned HAWKINS still had access to the SOM's system until early July 2020.

21. On or about June 29, 2020, State of Michigan's Fraud Investigation Unit (SOM-FIU) reviewed internal UIA records and identified several anomalies. SOM-FIU noticed that two specific UI claims that were fraud-stopped in MiDAS after being flagged as potentially fraudulent had been paid.

22. HAWKINS "discarded" the fraud-stops earlier on June 29, 2020 allowing these claims to be paid. In both instances, HAWKINS also neglected to notate the file as to why the stops were discarded.

23. Review of HAWKINS's assigned work items and call logs detailed that she had no legitimate reason to access, let alone modify, the claims. Investigating agents also noted that HAWKINS disregarded internal notations on the claims, including the following statement: *"Do not pay; do not close fraud investigation; refer to fraud unit if claimant contacts agency."*

24. SOM-FIU reviewed the audit logs for HAWKINS's user account and determined that she continued to remotely access SOM systems after her termination and was actively "discarding" fraud-stops and releasing payment on hundreds of fraudulent claims until early July 2020.

25. Between her termination on June 17, 2020 and June 29, 2020, HAWKINS accessed over four-hundred separate claims, and fraudulently enabled the disbursement of over two million dollars of government funds to be paid out on these fraudulent UI claims.

26. SOM-FIU has reviewed HAWKINS's MiDAS activity and determined that it appears to be both intentional and targeted. That is to say, investigating agents do not believe that she randomly discarded fraud-stops to release payments.

27. SOM-FIU has advised that HAWKINS searched the MiDAS system using exact names and/or Social Security Numbers (SSNs). Many of these claims were entered into the MiDAS system late in the night prior or in the early morning hours of the day that HAWKINS interacted with them.

28. In addition, HAWKINS discarded multiple fraud stops associated with twelve (12) separate claims using the same name with the initials "J.R." with twelve (12) different social security numbers between June 3, 2020 and June 29, 2020. Prior to HAWKINS's involvement, all of these claims had been stopped as

8

potential fraud. After HAWKINS's intervention, these claims were all paid to a single bank account.

29. UIA advised that these fraudulently processed funds included federal funds targeted for pandemic unemployment relief. As previously stated, the UIA receives over $10,000 in federal funding each year and HAWKINS processed over $5,000 in fraudulent claims. HAWKINS therefore violated 18 U.S.C. section 666 (Theft or Bribery Concerning Programs Receiving Federal Funds).

30. Most of these funds were processed through Bank of America (BOA), specifically through BOA data center locations in the states of Virginia and Texas. Therefore, the disbursement of these fraudulently obtained UI funds involved the use of interstate wires, which constitutes a violation of 18 U.S.C. section 1343 (Wire Fraud).

31. On July 7, 2020, federal agents executed a search warrant at HAWKINS's residence. Agents seized evidence including, but not limited to, several electronic devices to include cell phones, tablets, and the Microsoft surface tablet provided to her by her employer. Agents also seized numerous high-end handbags and other luxury goods.

32. HAWKINS was interviewed by federal agents at the time of the search warrant. HAWKINS admitted that she knowingly accessed the UIA system and approved claims without authorization.

33. From inside HAWKINS's residence, agents located and seized approximately $238,000 in cash and a print out of several receipts totaling thousands of dollars for electronics, jewelry, clothing, and the like. Some of these receipts corresponded to goods seized from HAWKINS's residence. A portion of the cash was found in a high-end backpack seized from the residence. Inside the backpack was also correspondence from BOA regarding a debit card, along with a PIN to be used for ATM withdrawals. Several debit cards were also located in HAWKINS's wallet.

34. Analysis of SOM's records show that bank accounts and debit cards processed through banks other than BOA also received proceeds of HAWKINS's fraud.

35. Bank records have been obtained to trace the proceeds of HAWKINS's fraudulent scheme. Analysis of these records has shown that, in some cases, shortly after fraudulent UI claim proceeds were deposited into a bank account by the SOM, funds were further transferred to separate bank accounts in the names of other individuals.

36. Records also show that fraudulent funds have been withdrawn via ATMs.

37. HAWKINS's conversion of fraudulent proceeds into easily portable luxury goods, the further movement of funds between bank accounts, and the withdrawal of fraudulent funds via ATM violate 18 U.S.C. 1956 (a) (Laundering of Monetary Instruments).

Nathan Eikost, Special Agent, USSS
Affiant

Sworn to before me and signed in my
presence and/or by reliable electronic means
on July __16,__ , 2020

Anthony P. Patti
United States Magistrate Judge